# UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

v.

JERRY SPANN

**FILED**
KC
JAN 17 2008
1-17-08
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

MAGISTRATE JUDGE MASON

CRIMINAL COMPLAINT

CASE NUMBER: 08CR 0044

I, HOLLY BARRILE, being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about October 10, 2007 in Cook county, in the Northern District of Illinois defendant(s) did,

conspire with another to knowingly and intentionally distribute a controlled substance, namely, 50 grams or more of a mixture and substance containing cocaine base, in the form of crack cocaine, a Schedule II Narcotic Drug Controlled substance, in violation of Title 21 U.S.C. § 841(a)(1),

in violation of Title   21   United States Code, Section(s)   846  .

I further state that I am a(n) Special Agent with the Federal Bureau of Investigation and that this complaint is
Official Title
based on the following facts:

See attached affidavit.

Continued on the attached sheet and made a part hereof:   X   Yes   ___ No

_Holly Barrile_
Signature of Complainant

Sworn to before me and subscribed in my presence,

January 17, 2008                                           at   Chicago, Illinois
Date                                                              City and State

MICHAEL T. MASON, U.S. MAGISTRATE JUDGE       _Michael T. Mason_
Name & Title of Judicial Officer                              Signature of Judicial Officer

State of Illinois        )
                         ) SS
County of Cook           )

## AFFIDAVIT

I, Holly Barrile, being first duly sworn on oath, depose and state as follows:

### Background of Affiant

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been so employed since 1996. In connection with my FBI duties, I investigate criminal violations of the federal narcotic laws, including but not limited to 21 U.S.C. § 841, 843, and 846. I also have received specialized training in the enforcement of laws concerning the activities of narcotic traffickers.

2. The information set forth in this Affidavit is based on my own participation in this investigation, my review of documents and reports related to this investigation, my review of audio and video recordings made during this investigation, information conveyed to me by other local, state, and federal law enforcement officers, and information provided by cooperating witnesses. Because this Affidavit is made for the limited purpose of establishing probable cause in support of the attached criminal complaint against DANIEL ANDERSON, aka "Boo," aka "Baby Stone" ("ANDERSON"), and JERRY SPANN, aka "Buddah" (SPANN), it does not contain everything that I or other law enforcement officers know about ANDERSON or SPANN, or the events described herein.

### Information Provided by a Cooperating Subject

3. Some of the information contained in this Affidavit has been provided by a

1

cooperating subject ("CS"). CS is a high ranking gang member and a subject in an ongoing FBI criminal investigation. The CS was arrested by agents for a narcotics offense in 2007. The CS was released from custody without charges at that time with the knowledge that the CS would be formally charged with federal narcotics violations following the conclusion of the CS's cooperation with the investigation. The CS was subsequently charged by criminal complaint with a narcotics offense in November 2007, based on his/her earlier arrest in 2007. No promises have been made to the CS as to what, if any, consideration he/she may receive in exchange for his/her cooperation. The CS has previous convictions for aggravated battery, aggravated unlawful restraint, armed robbery, home invasion, residential burglary, possession of a controlled substance, and robbery.

4.  CS is a member of the Black P-Stone Nation street gang ("BPSN"). CS has identified SPANN as a BPSN member with a significant responsibility for drug distribution in an area on the South Side of Chicago controlled by the BPSN, and has identified ANDERSON as a BPSN gang member.

5.  The information provided by the CS in this Affidavit has been corroborated by law enforcement officers whenever possible by, among other things, the use of electronic recording devices and physical surveillance. I have included my understanding of some of the words and phrases used in the recorded conversations set forth in the Affidavit. My understanding is based on the content and context of the conversations, information provided by the CS who participated in the recorded conversations, my training and experience, and the experience of other law enforcement officers.

### October 10, 2007 Drug Transaction

6.  On October 10, 2007, agents met with CS for the purpose of having CS purchase 4.5

2

ounces (approximately 126 grams) of crack cocaine from SPANN, using ANDERSON to assist with the transaction. At the meeting, agents provided the CS with $3,200 in pre-recorded government funds to purchase the narcotics, equipped the CS with a concealed audio and video recorder, and searched the CS and his/her vehicle for weapons, drugs, contraband and/or excessive funds. None was found. The CS then drove, followed by agents, to meet with ANDERSON.

7.      Agents observed the CS meet with ANDERSON at 52nd and Racine at approximately 1:42 p.m. ANDERSON was later identified by the CS on 10/14/2007 from a Chicago Police arrest photo (before then, CS only knew him as "Boo," or "Baby Stone"), and identified by an FBI agent after a review of the consensually-recorded video. ANDERSON entered the CS's vehicle and sat in the front passenger seat. According to the CS, ANDERSON used CS's cellular telephone at approximately 1:44 p.m. to contact SPANN at telephone number (773)414-6106. During this conversation, ANDERSON was recorded saying, "Where you at G? Shit, we're right here with the people." ANDERSON then told the CS, "In like 15 minutes, he'll call, we can go sit by your building."

8.      The CS then drove ANDERSON to the CS's building located in Chicago. While enroute, the CS told ANDERSON, "Hey Boo, man, for real man, make sure these boys get some good crack, don't let Buddah[1] give them no bullshit." ANDERSON responded, "..., on my momma, he's fittin to call us, we're going to come together and get it." The CS told ANDERSON, "I don't know shit, I'm just making sure it happen G, G cause they'll keep coming back spending money with you G, just make sure Buddah give them some good ass cook G." The CS explained to

---

[1] According to the CS and Chicago Police arrest records, "Buddah" is an alias for SPANN.

3

ANDERSON that if the quality of the crack cocaine was not going to be good, he/she did not want to buy it because the people who were buying it from the CS would not return for future purchases of crack cocaine. The CS previously told ANDERSON that he/she was getting the crack cocaine for somebody else. The CS said, "As long as you're sure your man Buddah give them the best shit he could..." ANDERSON replied, "Right."

9. At approximately 1:46 p.m., ANDERSON and CS arrived at CS's building. The CS exited the vehicle and met with a person who he/she indicated to ANDERSON was the person he/she was getting the crack cocaine for. The CS then remained outside of the vehicle and spoke with other individuals and ANDERSON. ANDERSON remained inside the vehicle. At approximately 1:50 p.m., the CS asked ANDERSON, "How didn't Buddah leave it in the [unintelligible]." ANDERSON replied, "Man, he got spooked man..." ANDERSON then told the CS of an incident where ANDERSON and SPANN were implicated in a murder in Minnesota in which ANDERSON was questioned by the police. ANDERSON said, " They were questioning me about Buddah, I called my wife Sue, tell that boy (SPANN) to pack it up and leave, whatever he leave I bring ya. Now they on the prowl, they looking for him."

10. At approximately 1:55 p.m., the CS re-entered the driver's seat of his/her vehicle. The CS told ANDERSON, "I hope you don't give me no bullshit G...they be saying you all be having that stuff shake and bake." The CS further stated, " As long as I know I can give you the money and I know you're going to get it from your man, I aint gotta worry about shit. I'm cool." ANDERSON told the CS, "When he calls us and he telling he right on Racine, I can go get it, go right there where he at, give him the money and bring that shit back, or you can go, however you want to do it, man."

11. At approximately 2:08 p.m., the CS handed ANDERSON his/her cellular telephone

4

so ANDERSON could call SPANN. At approximately 2:09 p.m., ANDERSON told the CS, "He ain't answering, it went to voicemail." ANDERSON handed the phone back to the CS.

12. At approximately 2:10 p.m., while the CS and ANDERSON were still in the CS's vehicle parked at the CS's building, the CS received a call on his/her cellular phone and answered the phone by saying, "Hello." Recognizing the number as the number previously used by ANDERSON to call SPANN, the CS quickly handed the phone to ANDERSON. ANDERSON was overheard saying, "I'm right here on 55th sitting with my man waiting on you." ANDERSON hung up the phone and told the CS, "Let's do it." The CS asked, "Buddah ready right now?" ANDERSON responded, "Yeah." The CS and ANDERSON departed to meet with SPANN at approximately 2:10 p.m. While traveling to the meeting, the CS told ANDERSON, "Make sure Buddah gives me some good shit G and make sure it's alright G." ANDERSON replied, "Come on, man."

13. The CS and ANDERSON parked in front of 5327 S. Racine at approximately 2:12 p.m. The CS asked ANDERSON, "Do you need the money now?" ANDERSON responded, "No." ANDERSON then exited the vehicle and walked northbound towards 5319 S. Racine. ANDERSON walked back, re-entered the vehicle at approximately 2:16 p.m., and asked, "He didn't call back?" The CS handed ANDERSON the phone. ANDERSON dialed a number, and was overheard saying, "I'm in front of the crib."

14. At approximately 2:27 p.m., ANDERSON told the CS, "I should run in there and show you that 40 [.40 caliber pistol] I got in the crib, I'm waiting for a motherfucker to get stupid...I'll come right out the door with my black on, slide right out the back, there ain't no talking." ANDERSON then asked, "How much is that, 28?" referring to the amount of money. The CS handed ANDERSON the $3200 so ANDERSON could take his cut. ANDERSON then counted the

money.

15.　At approximately 2:29 p.m., the CS received a telephone call. The CS said "Hello," then handed the phone to ANDERSON. The CS later told agents that SPANN was the person who was calling. ANDERSON was overheard saying "alright," then told the CS, "He say he right there coming across 63rd and Racine right now." ANDERSON then began arguing with the CS about the money. ANDERSON told the CS, "I'm charging just what he told me to charge. Come on G that don't look right."

16.　At approximately 2:30 p.m., ANDERSON told the CS, "I'm gonna ride with you to take this over there in case we got to you know dash, but I know we ain't." The CS told ANDERSON that he/she didn't want him to do that.

17.　At approximately 2:37 p.m., agents observed SPANN arrive driving a blue Chevrolet Caprice, registered to Neal Daija of 6813 S. Paulina in Chicago. Agents identified SPANN from an earlier-obtained driver's license photo. SPANN parked in front of the CS's vehicle. ANDERSON exited the CS's vehicle. The CS asked ANDERSON, "You got that money, G?" ANDERSON replied, "Yeah," and walked towards SPANN.

18.　The CS remained in the vehicle while ANDERSON conducted the transaction with SPANN. At approximately 2:41 p.m., the CS called an agent and advised that he/she was just waiting for them to bring the crack cocaine to him/her. The CS confirmed to the agent on the telephone that SPANN was meeting with ANDERSON. The CS later advised agents that ANDERSON exited the CS's vehicle when SPANN arrived. The CS observed ANDERSON and SPANN meet each other and walk northbound. The CS then observed SPANN go into a house and ANDERSON return to the CS's vehicle, standing outside of it near the front right corner of the

6

vehicle. The CS observed SPANN walk back to the CS's vehicle and meet with ANDERSON. The CS observed SPANN and ANDERSON exchange the suspected crack cocaine and money. ANDERSON then returned into the CS's vehicle. SPANN walked back towards the residence. Law enforcement surveillance observed the meeting between ANDERSON and SPANN in front of the CS' vehicle.

19. It was approximately 2:42 p.m. when the transaction was completed and ANDERSON re-entered the CS's vehicle. ANDERSON handed the CS two clear plastic bags that contained a total of approximately 4.5 ounces of a chunky, off-white substance. The CS told ANDERSON, "I'll give that to Hammer, go ride out." ANDERSON said, "You're cool, you want me to go back with you?" The CS told him, "No." ANDERSON replied, "All's well" and exited the CS's vehicle.

20. After the purchase was completed, the CS, followed by agents, drove directly to the predetermined meeting location. Agents never lost sight of the CS as he drove to the meeting location. There, agents deactivated the recording device, and then took possession of the recording device and the suspected crack cocaine from the CS. Agents again searched the CS and his/her vehicle for weapons, drugs, contraband and excessive money, none of which were found.

21. The suspected crack cocaine was subsequently tested by the DEA laboratory, which concluded that the substance contained 110.2 grams of a chunky, off-white substance containing cocaine base.

22. I believe that the substance purchased from SPANN and ANDERSON was crack cocaine based on, among other things: (1) my experience as a law enforcement officer; (2) a visual inspection of the off-white chunky substance; (3) a positive field test for the presence of cocaine; and

(4) a review of the DEA laboratory report.

23. Based on the foregoing, I respectfully submit that there exists probable cause to believe that JERRY SPANN and DANIEL ANDERSON conspired to knowingly and intentionally distribute a controlled substance, namely, fifty grams or more of a mixture and substance containing cocaine base, in the form of "crack" cocaine, in violation of Title 21, United States Code, Section 841(a)(1), in violation of Title 21, United States Code, Section 846.

*Holly Barrile*
HOLLY BARRILE
SPECIAL AGENT, FEDERAL BUREAU
OF INVESTIGATION

Sworn to and subscribed to before me on
this 17th day of January 2008

*Michael T. Mason*
MICHAEL T. MASON
UNITED STATES MAGISTRATE JUDGE